IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| **WORLD IMPORTS, LTD., et al.,** | : | |
| | : | |
| Appellees, | : | |
| | : | |
| v. | : | **CIVIL ACTION** |
| | : | **NO. 13-5085** |
| | : | |
| **OEC GROUP NEW YORK,** | : | |
| | : | |
| Appellant. | : | |

**MEMORANDUM OPINION**

**Tucker, C. J.**                                                                                             **January 22, 2015**

      Presently, before this Court is an appeal from a July 25, 2013 Order entered by the Honorable Stephen Raslavich, United States Bankruptcy Judge for the Eastern District of Pennsylvania, granting the Complaint for Turnover filed by Appellees World Imports, Ltd. ("Debtors"). Upon consideration of the parties' briefs and exhibits, this Court affirms the judgment of the Bankruptcy Court.

**FACTUAL BACKGROUND**

      Appellant OEC Group New York ("OEC") is a non-vessel operating common carrier ("NVOCC") that internationally transports merchandise for the Debtors by the sea. The Debtors are wholesale purchasers of furniture. OEC arranges direct shipping to the Debtors' warehouse, pick up of goods at Debtors' warehouse by Debtors' domestic carrier, or shipment of the goods to Debtors' customers throughout the United States. (See Appellant's Br. at 3, Doc. 3).

      On July 3, 2013, the Debtors petitioned for relief under Chapter 11 of the Bankruptcy Code. Upon doing so, the Debtors sought to compel the turnover of goods in OEC's possession.

1

At that time, OEC held claims against the Debtors for freight, storage, and various shipping charges relating to the Debtors' goods in the amount of $1,452,956. Of that amount, $458,251 consisted of charges relating to goods in OEC's possession at the time of the bankruptcy petition (the "Landed Goods"); the remaining $994,705 consisted of freight and related charges associated with goods OEC previously delivered and released to the Debtors (the "Prepetition Goods"). OEC also held claims for goods in transit, which had not yet arrived at the time ("Goods in Transit"). OEC claims that the value of the goods in its possession at the time of the Bankruptcy Court Order was approximately $1,926,363. (See id. at 6). The Debtors offered to pay to OEC freight charges on the Landed Goods of approximately $120,000 for OEC's turnover of the goods in its possession, but OEC refused this offer.

On July 12, 2013, OEC filed a Motion to Lift Stay in the bankruptcy action, asserting that it was a secured creditor with a possessory lien on goods. OEC claimed that it was entitled to refuse to release the Landed Goods unless and until the Debtors also paid for the Prepetition Goods. OEC argued that it had a maritime lien on the goods in its possession that extended to the Prepetition Goods because the parties agreed to extend the lien on all of the Debtors' property for all amounts due OEC. To support this proposition, OEC relied on its tariff and the terms and conditions of its bills of lading, invoices, and credit agreement with the Debtors. The Debtors maintained that OEC held a lien on the Landed Goods and the Goods in Transit, but not the Prepetition Goods because OEC had already released the Prepetition Goods without requiring payment.

On July 18, 2013, the Debtors filed an adversary proceeding against OEC seeking, inter alia, turnover of the goods in OEC's possession. The Debtors argued that OEC did not have a maritime lien or common carrier lien on goods to secure the Prepetition Goods. On July 25,

2

2013, the Bankruptcy Court granted the Debtors relief and ordered OEC to turn over the goods in its possession upon the Debtors' payment of the $120,000 in freight charges for the Landed Goods. The Bankruptcy Court also held that OEC did not possess a maritime lien for the goods in its possession for the Prepetition Goods. The Bankruptcy Court issued a written Opinion on August 14, 2013 in support of its July 25, 2013 Order. In compliance with the Bankruptcy Court Order, the Debtors remitted the $120,000 freight charges to OEC and OEC subsequently released the goods in its possession to the Debtors.

On August 1, 2013, OEC appealed the Bankruptcy Court's Order to this Court requesting that this Court reverse the Bankruptcy Court's decision and order the Debtors to pay to OEC all amounts owed for transportation services. Alternatively, OEC requests that this Court enter an Order providing OEC with replacement liens on the Debtors' assets in the amount of $1,926,363, the amount at which OEC claims the goods in its possession at the time of the Bankruptcy Court Order were valued. OEC raises two issues on appeal: 1) "Whether express provisions in maritime contracts giving the transportation provider liens on goods in its possession for freight charges on those goods, as well as for unpaid charges on prior shipments, are enforceable" and 2) "whether contractual maritime liens prime Uniform Commercial Code ("UCC") security interests." (Id. at 2).

## STANDARD OF REVIEW

Pursuant to 28 U.S.C. § 158(a), jurisdiction is proper in this Court. In reviewing the Bankruptcy Court's judgment on appeal, this Court reviews the Bankruptcy Court's legal determinations *de novo*, its factual findings for clear error, and its exercise of discretion for an abuse thereof. See, e.g., In re Heritage Highgate, Inc., 679 F.3d 132 (3d Cir. 2012); In re Grayboyes, No. 05-1780, 2006 WL 437546, at *3 (E.D. Pa. Feb. 22, 2006).

## DISCUSSION

### A. OEC Does Not Possess A Valid Maritime Lien On the Prepetition Goods

OEC asserts a maritime lien for the freight charges associated with the goods in its possession at the time of the Debtors' bankruptcy petition, as well as charges associated with the Prepetition Goods. OEC maintains that the parties agreed to extend the maritime lien beyond the charges for goods in its possession. To support its claim that it holds a valid maritime lien, both for the goods in its possession and for the Prepetition Goods, OEC primarily relies on two cases, The Bird of Paradise, 72 U.S. 545 (1866) and Gray v. Freights of the Kate, 63 F. 707 (S.D.N.Y. 1894).

Maritime liens are an ancient feature of admiralty doctrine providing "security to the victims of certain maritime torts and contract breaches." Cardinal Shipping Corp. v. M/S Seisho Maru, 744 F.2d 461, 466 (5th Cir. 1984). "Under United States law, a shipowner holds a maritime lien on cargo for charges incurred in the course of carriage." Eagle Marine Transp. Co. v. A Cargo of Hardwood Chips, No. 98-1919, 1998 WL 382141, at *2 (E.D. La. July 8, 1998) (citing Arochem Corp. v. Wilomi, Inc., 962 F.2d 498, 499 (5th Cir. 1992)). Maritime liens exist to facilitate commerce, providing a security device to keep ships moving in commerce while preventing them from escaping their debts. See Riffe Petroleum Co. v. Cibro Sales Corp., 601 F.2d 1385, 1389 (10th Cir. 1979). A maritime lien also affords the consignee a lien on the ship, which is conditional on the delivery of the goods. See The Bird of Paradise, 72 U.S. at 562–63 ("Whenever the owners of the ship constitute one party, and the owners of the cargo the other, the law of freight applies, and the fundamental rule . . . is that the rights of the respective parties are reciprocal, and that each has a lien against the other to enforce those rights . . . ."); Bank One, Louisiana N.A. v. MR. DEAN MV, 293 F.3d 830, 834 (5th Cir. 2002) ("Shipowners contract for

the safe custody, due transport, and right delivery of the cargo, and for the performance of their contract the ship, her apparel and furniture, are pledged in each particular case, and the shipper, consignee, or owner of the cargo, contracts to pay the freight and charges, and to the fulfillment of their contract the cargo is pledged to the ship, and those obligations are reciprocal, and the maritime law creates reciprocal liens for their enforcement.") (quoting The Maggie Hammond, 76 U.S. 435, 450 (1869)).

Maritime liens are established by operation of law. See The Bird of Paradise, 72 U.S. at 555 (stating that a maritime lien "arises from the usages of commerce, independently of the agreement of the parties, and not from any statutory regulations"); see also, Vestoil, Ltd. v. M/V M Pioneer, 148 Fed. Appx. 898, 900 (11th Cir. 2005) ("[I]t is settled law in the United States that a maritime lien can arise only by operation of law, regardless of any agreement between the parties."); Marine Oil Trading Ltd. v. Motor Tanker PAROS, 287 F. Supp. 2d 638, 644 (E.D. Va. 2003) ("While a maritime lien does arise by operation of law rather than by agreement between the parties, there are a number of reasons for including contractual language alerting the parties to the existence of a lien on the ship. This language does not, however, actually give rise to the lien.").

Maritime liens are *stricti juris*, secretly operating "to the prejudice of general creditors and purchasers without notice." Vandewater v. Mills, Claimant of Yankee Blade, 60 U.S. 82 (1856); Osaka Shosen Kaisha v. Pacific Export Lumber Co., 260 U.S. 490, 499 (1923). As a result, maritime liens cannot be extended by construction, analogy or inference; they must be strictly construed. See, e.g., Osaka Shosen Kaisha, 260 U.S. at 499; Melwire Trading Co., Inc. v. M/V Cape Antibes, 811 F.2d 1271, 1273 (9th Cir. 1987).

The maritime lien is possessory in nature, but it "is lost by an **unconditional delivery** to the consignee." In re 4,885 Bags of Linseed, 66 U.S. 108, 113 (1861) (emphasis added); see, e.g., Atlantic Richfield Co. v. Good Hope Refineries, Inc., 604 F.2d 865, 872 (5th Cir. 1979); Eagle Marine Transp. Co., 1998 WL 382141, at *2. If the maritime lien is preserved, the carrier or shipowner may retain the goods until the amount of the lien is paid.

The Supreme Court has endorsed the contractual modification of maritime liens in a few limited contexts. For example, parties may "frame their contract as to exclude [the maritime lien] altogether." The Bird of Paradise, 72 U.S. at 555. Parties may also affirm the existence of the maritime lien, or extend or modify it. Id. Where parties choose to extend or modify the maritime lien, this modification is limited to very specific circumstances. As stated by the Supreme Court in The Bird of Paradise, parties

> may agree that the goods, when the ship arrives at the port of destination, shall be deposited in the warehouse of the consignee or owner, and that the transfer and deposit shall not be regarded as the waiver of the lien; and where they so agree, the settled rule in this court is, that the law will uphold the agreement and support the lien.

Id.; see also The Eddy, 72 U.S. 481, 495–96 (1866) ("Parties may agree that the goods shall be deposited in the warehouse of the consignee or owner, and that the transfer and deposit shall not be regarded as a waiver of the lien, and where they so agree the courts of admiralty will uphold the agreement and support the lien . . . ."); In re 4,885 Bags of Linseed, 66 U.S. at 114–15 ("[I]f it appears by the evidence that such an understanding [that transferring the goods from the ship to the warehouse shall not be regarded as a waiver of the lien] did exist between the parties, before or at the time the cargo was placed in the hands of the consignee . . . a court of admiralty will regard the transaction as a deposit of the goods, for the time in the warehouse, and not as an absolute delivery; and, on that ground, will consider the ship-owner as still constructively in

possession, so far as to preserve his lien . . . ."). In The Bird of Paradise, the Supreme Court explains that an agreement will preserve a maritime lien where it would otherwise be lost, when a shipper transfers goods to the consignee's warehouse. The agreement authorizes a conditional delivery.

Courts permit the extension or modification of maritime liens in the context more fully described in In re 4,885 Bags of Linseed out of practical concerns – namely to facilitate trade. As explained in In re 4,885 Bags of Linseed, courts consider equitable principles and the usages and necessities of trade when executing maritime contracts and liens. 66 U.S. at 114. The necessities and usages of trade often require that the cargo pass into the hands of the consignee before he pays the freight. Id. The shipowner's interest is such that "his vessel should discharge her cargo as speedily as possible after her arrival at the port of delivery" instead of waiting for the consignee to pay the freight at the consignee's convenience or waiting to enforce the lien in court. Id. The consignee may also want to wait for the cargo to be discharged before paying freight charges so as to ascertain that all of the goods arrived undamaged. Id. Accordingly, such a delivery would not waive the lien.

It is in this context, described in The Bird of Paradise and The Eddy, and more fully detailed in In re 4,885 Bags of Linseed, that the Supreme Court contemplated the extension or modification of maritime liens. Specifically, those cases, unlike the instant matter, dealt with the limited context of asserting a maritime lien on an existing shipment for those same goods. No Supreme Court decision has addressed whether parties may contractually modify a maritime lien to make the delivery of existing shipments contingent on the consignee's payment for already-delivered shipments. As maritime liens are to be strictly construed, this Court declines OEC's invitation to extend or modify maritime liens beyond the circumstances indicated by Supreme

7

Court precedent. See Osaka Shosen Kaisha, 260 U.S. at 499; Melwire Trading Co., 811 F.2d at 1273.

In this case, OEC contends that it contractually extended its maritime lien on the existing shipment (the goods in its possession at the time of the Debtors' bankruptcy petition) to secure payment for the Prepetition Goods. OEC relies on The Bird of Paradise for the premise that parties may contractually modify or extend a maritime lien as they choose and that courts will uphold the purported lien. In doing so, OEC broadly construes the Supreme Court's holding in The Bird of Paradise and endeavors to persuade this Court that The Bird of Paradise would allow OEC to extend its maritime lien on an existing shipment to goods previously released and delivered. However, as detailed above, OEC's argument is plainly not supported by Supreme Court precedent or equitable principles.

In The Bird of Paradise, the Supreme Court stated that the parties may "extend or modify" a maritime lien. 72 U.S. at 555. However, The Bird of Paradise dealt only with the limited context of extending a maritime lien on goods past the initial delivery of those same goods. For practical reasons, where there is an understanding between the parties, the discharge of goods to the consignee prior to payment would not displace the maritime lien. See, e.g., In re 4,885 Bags of Linseed, 66 U.S. at 114. In the instant matter, however, the practical considerations undergirding the Court's reasoning in In re 4,885 Bags of Linseed are absent. There was no situation implicating a speedy discharge of cargo to facilitate commerce. See id. Here, the Prepetition Goods had already been delivered to the Debtors. OEC only possessed the Landed Goods and the Goods in Transit at the time of the bankruptcy petition. However, OEC did not seek to extend its maritime lien to ensure payment of those goods in its possession past delivery. In fact, the Debtors offered to pay the $120,000 in freight charges for those goods in

8

OEC's possessions. Instead, OEC sought to extend its maritime lien for the Prepetition Goods, which had already been delivered, and perhaps, in the hands of others. Consistent with Supreme Court precedent, OEC's maritime lien would have extended only to the existing shipment – the goods actually in its possession at the time of the bankruptcy petition – not the Prepetition Goods, those already unconditionally delivered.

In Atlantic Richfield Co. v. Good Hope Refineries, the Fifth Circuit concluded that the parties did not intend to contractually modify a maritime lien on undelivered cargoes to secure unpaid charges on already-delivered cargo. 604 F.2d at 873. In refusing to interpret the contract in this manner, the Court noted that an extended maritime lien would extend to subsequent cargoes bought by innocent third parties:

> The expansive interpretation of this maritime lien clause adopted below would have consequences far beyond the situation where the cargo belonged to the charterer and was seized before it left the vessel. The lien for the debts of past voyages would extend to cargo owned by others, and might, if all the other terms of the entire clause were literally enforced, follow that cargo after delivery, even if all freights due for its carriage were paid.

Id. Consequently, the Court declined to adopt such an expansive interpretation of the lien.

Similarly, equitable considerations do not support allowing parties to extend a maritime lien on current shipments to already-delivered shipments. Doing so could very well prejudice third-party purchasers of undelivered goods and frustrate trade. Specifically, the shipper's refusal to deliver goods on the condition that the consignee pays for already-delivered goods could prejudice the innocent purchaser of the consignee's undelivered goods. See id. A third-party purchaser of the undelivered goods would have no notice that the goods it purchased could be withheld pursuant to a maritime lien on previously-shipped goods. Accordingly, equitable considerations do not support permitting the parties to contractually modify a maritime lien in the manner proposed by OEC.

OEC next relies on Gray v. Freights of the Kate for the proposition that maritime liens can be extended by contract and will be enforced according to the terms upon which the parties agreed. 63 F. 707 (S.D.N.Y. 1894). In Freights of the Kate, a banking firm issued lines of credit to a steamship company on the condition that "all freight moneys earned and to be earned . . . are hereby pledged and hypothecated to" the banking firm. Id. at 710. The steamship company failed, and likewise failed to fully compensate the bankers for the funds withdrawn from the bankers' line of credit. Id. Accordingly, the banking firm filed suit in equity to impound the freights pursuant to the express hypothecation. Id. at 711. The court held that the express hypothecation between the banking firm and the steamship company was a maritime contract, creating a general lien as to all freights of the company's line, including future voyages of the same vessels "except as against subsequent bona fide purchasers or incumbrancers, until the lien is paid, or lost by laches." Id. at 714.

Freights of the Kate does not involve a maritime lien between a shipowner or carrier and a buyer of goods—where the shipowner or carrier may assert a lien on the cargo for the freight and the buyer may assert a lien on the ship. See The Bird of Paradise, 72 U.S. at 563; Bank One, Louisiana N.A., 293 F.3d at 834. The maritime lien at issue was between a steamship company and a banking firm. The banking firm did not seek to purchase the cargo in question. The firm sought to assert a lien against the freight, not the steamships. This case does not address the scenario discussed in The Bird of Paradise, where the shipowner's failure to deliver the cargo permits the buyer to assert a lien on the ship. The court did not discuss The Bird of Paradise or the propriety of extending a maritime lien beyond the limited context approved by that case. Thus, Freights of the Kate is factually distinguishable. Any persuasive value that Freights of the Kate may have is undercut by the court's lack of discussion as to the reciprocal obligations of

10

ship and cargo. See The Bird of Paradise, 72 U.S. at 563; see also Krauss Bros. Lumber Co. v. Dimon S.S. Corp., 290 U.S. 117, 125 (1933) (explaining the mutual and reciprocal nature of the obligations of ship and cargo under the contract of affreightment). The present dispute is factually analogous to The Bird of Paradise, which discussed the reciprocal obligations between a shipowner and the owner of the ship's cargo. Accordingly, this court concludes that Freights of the Kate does not authorize the contractual extension of a maritime lien outside of the limited context discussed in The Bird of Paradise where, as here, the parties include a buyer of goods and a carrier.

OEC also relies on Eagle Marine Transp. Co., where the terms of the parties' contract purported to extend a maritime lien to previous shipments. 1998 WL 382141. Eagle Marine Transport Co. ("Eagle") contracted to ship woodchips for Guthrie Corporation ("Guthrie"). The contract provided Eagle "a maritime lien on all cargo which it may assert and enforce to ensure payment of the freight and demurrage on all current en route shipments and **earlier completed shipments**." Id. at *1 (emphasis added). After Guthrie failed to pay freight charges, Eagle asserted a maritime lien on the woodchips. The court did not specify whether the unpaid freight charges were for past shipments or the present shipments. At issue was whether Eagle unconditionally discharged the woodchips, thereby displacing the lien. The court determined that the parties intended for the lien to survive delivery. The court did not discuss whether a maritime lien may validly extend to freight charges on past shipments. It is also unclear whether the lien at issue was asserted to enforce payment of freight charges to previous shipments. Consequently, Eagle Marine Transp. Co. does not provide any meaningful support for OEC's position.

OEC unavailingly turns to several other cases to support its effort to extend its maritime lien to the Prepetition Goods, but the Court is unconvinced. See Capital Transp., Inc. v. U.S., 612

11

F.2d 1312 (1st Cir. 1979) (holding that relevant tariffs provided that carriers' liens survived delivery of goods, but failing to discuss extending lien for already-delivered goods to subsequent shipments); Arochem Corp., 962 F.2d at 500 (concluding that parties must have intended the maritime lien to survive delivery for practical purposes; hence delivery was conditional because "[n]o rational person would establish a lien on cargo for certain costs that are due after delivery of the cargo but have delivery of the cargo extinguish the lien"); Logistics Mgmt., Inc. v. One (1) Pyramid Tent Arena, 86 F.3d 908 (9th Cir. 1996) (holding that a NVOCC preserved its cargo lien by maintaining actual or constructive possession of cargo, but not addressing extension of lien to prior or future cargo); Cross Equip. Ltd. V. Hyundai Merch. Marine (Am.) Inc., 214 F.3d 1349 (5th Cir. 2000) (discussing whether a carrier had a valid maritime lien over undelivered cargo where the shipper did not pay repair charges, but failing to discuss the extension of a maritime lien on already-delivered goods to subsequent shipments); Maersk-Sealand v. Eurocargo Express, LLC, No. 02-3230-MLG, 2004 WL 1950372 (C.D. Cal. Apr. 8, 2004) (addressing the enforcement of a general lien, not a maritime lien, where neither party debated the validity of the lien provision establishing or modifying a maritime lien).

For the foregoing reasons, the Court concludes that the provisions in OEC's contract with the Debtors purporting to give OEC a lien on goods in its possession for freight charges for the Prepetition Goods is unenforceable.

### B. Although Maritime Liens Prime UCC Security Interests, OEC Cannot Assert A Valid Maritime Lien

OEC limits the second question it presents on appeal to this Court to whether contractual maritime liens prime UCC security interests. (See Appellant's Br. at 2, Doc. 3). Central to OEC's argument is its mistaken assumption that it possessed a valid maritime lien for the Prepetition

Goods. OEC disputes the Bankruptcy Court's analysis of OEC's claims under the New York Uniform Commercial Code ("UCC"), UCC § 7-307(1) contending that the UCC does not govern maritime liens, which prime UCC security interests. (See id. at 22). Specifically, OEC claims that its supposed maritime lien "on the goods in its possession primes the lien of any non-maritime secured creditor, including the security interests of PNC Bank." (Id. at 24). The Debtors do not dispute that maritime liens prime UCC security interests, but rather, they argue that the Prepetition Goods are not secured by a valid maritime lien. (See Appellee's Br. at 15, Doc. 6).

Since this Court has concluded that OEC does not possess a valid maritime lien for the Prepetition Goods, OEC's arguments here also fail. OEC correctly argues that maritime liens prime UCC security interests. See, e.g., The J.E. Rumbell, 148 U.S. 1 (1893); United Shipping Serv. Three, Inc. v. U.S. Express Lines, Ltd., No. 98-950, 1998 WL 770599, *2–*3 (E.D. Pa. Nov. 5, 1998) ("Maritime liens customarily have priority over other security interests."). However, OEC cannot assert a maritime lien to prime any UCC security interests. The Court need not address whether OEC's general lien primed PNC Bank's security interests on the Debtors' property, as this issue was not raised on appeal.

## CONCLUSION

For the foregoing reasons, the Court affirms the July 25, 2013 Bankruptcy Court Order. An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| **WORLD IMPORTS, LTD., et al.,** : | |
| : | |
| Appellees, : | |
| : | |
| v. : | CIVIL ACTION |
| : | NO. 13-5085 |
| : | |
| **OEC GROUP NEW YORK,** : | |
| : | |
| Appellant. : | |

### ORDER

**AND NOW**, this 22nd day of January, 2015, upon consideration of Appellant OEC Group New York's Appeal of the Bankruptcy Decision (Doc. 3), Appellees World Imports Ltd.'s response in opposition thereto (Doc. 6), Appellant's Reply Brief (Doc. 7), Appellant's Supplemental Brief (Doc. 12), Appellee's Supplemental Brief (Doc. 13), and all other the briefs and materials submitted by the parties, **IT IS HEREBY ORDERED AND DECREED** that the Bankruptcy Decision rendered by Honorable Stephen Raslavich of the United States Bankruptcy Court for the Eastern District of Pennsylvania in In re World Imports, Ltd., Inc., Bankr. Nos. 13-15929, 13-15933, 13-5934, 13-15935, Adv. No. 13-00402 is **AFFIRMED**.

                                                          **BY THE COURT:**
                                                          **/s/ Petrese B. Tucker**

                                                          _____

                                                          **Hon. Petrese B. Tucker, C.J.**